**INTERMEDICS, INC., a Texas corporation, Plaintiff,**

v.

**VENTRITEX, INC., a California corporation; Michael Sweeney, an individual; and Benjamin Pless, an individual, Defendants.**

**No. C 90 20233 JW (WDB).**

United States District Court, N.D. California.

Sept. 2, 1992.

Jeffrey Olson and Paul Meier of Lyon and Lyon, Los Angeles, Cal., for plaintiff.

Denis Salmon, Luther Orton, and Henry Bunsow of Brobeck, Phleger & Harrison, Palo Alto, Cal., and John Keker and Jeffrey Chanin of Keker and Brockett, San Francisco, Cal., for defendants.

## OPINION AND ORDER RE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BRAZIL, United States Magistrate Judge.

### I. PROCEDURAL BACKGROUND

On March 16, 1992, defendants filed a motion for partial summary judgment in which they asked the court to rule that plaintiff was barred from pursuing relief with respect to 20 of plaintiff's 49 alleged trade secrets.[1] As originally filed, defen-

---

1. Plaintiff submitted, by letter dated October 16, 1991, to Denis R. Salmon, Esq., counsel for defendants (a copy of this letter is attached as Exhibit G to the Declaration of Mr. Salmon filed March 16, 1992, in support of defendants' motion), the "final" list of trade secrets on which this litigation is proceeding. (This was a list of 50 trade secrets. It was amended shortly thereafter to add another trade secret, numbered

"5.1" and to make minor amendments to the language of trade secret numbers 7 and 35. This amendment was approved by this court by order dated January 13, 1992. Also, by letter dated March 12, 1992, counsel for plaintiff notified this court that it was withdrawing trade secret numbers 49 and 50, leaving a total of 49.) The trade secrets that were the subject of the defendants' motion as originally filed were

dants offered three independent grounds for their motion: *res judicata*, the statute of limitations, and laches. In subsequent filings defendants withdrew, for purposes of this motion, the laches ground. *See* Reply (filed July 7, 1992), p. 2, n. 2. Defendants also decided not to pursue summary judgment (at least through this motion) with respect to two of the twenty alleged trade secrets that they originally had targeted in their moving papers: numbers 8 and 28. Well after defendants had filed their motion, and at least in part as a result of learning provided through the discovery process in this case, plaintiff re-examined its allegations and elected not to pursue relief with respect to certain of its 49 alleged trade secrets.[2] As a result of these decisions by the parties, 15 alleged trade secrets remain formally the subject of this motion by defendants for partial summary judgment: numbers 4, 15, 17, 19, 22, 23, 24, 27, 32, 33, 38, 39, 40, 41, and 42.

After a hearing on defendants' motion on July 14, 1992, and before the parties had completed making their follow-up submissions, defendants asked the court to divide the trade secrets aspects of this case (the patent portions are stayed) into two parts, permitting full discovery and trial to go forward in the first part only as to a very limited number of the alleged trade secrets. After considering all parties' views on this matter, the court decided, on July 29, 1992, to divide the case along the lines suggested by defendants, but to order that the trial in November of this year be limited not to four trade secrets, but to six (with respect to those six, all bases for relief and all possible defenses will be litigated). By Order issued orally on July 29, 1992, the court directed plaintiff to select four of its trade secrets (as identified in its October 16, 1991 list) for the November trial; the court simultaneously directed defendants to designate two of the alleged secrets for that trial. In the resulting designations, plaintiff selected alleged secrets 4, 13, 22, and 25 for the November trial; defendants selected numbers 36 and 43. Of these six, numbers 4 and 22 remain the subject of defendants' motion for partial summary judgment.

Because only two of the 15 alleged trade secrets that are the subject of the pending motion also have been selected for the November trial, we focus in the sections that follow on those two (numbers 4 and 22). Formally, we elect not to rule at this time on the defendants' motion as it relates to the other 13 alleged trade secrets. As noted below, we will permit defendants to reactivate their motion with respect to alleged trade secret number 22 after deposing Dr. Kovacs, assuming they do so promptly (on a schedule that would not result in any interference with the November trial date). After the November trial and after the parties, using the learning that trial is expected to provide, conclude the intensive settlement negotiations that are contemplated for early next year, defendants may re-activate their motion with respect to any alleged trade secret that remains to be litigated.

We expect the utility of this opinion, however, not to be confined to the temporary disposition of the motion as it relates to the two alleged trade secrets on which we focus. Much of the reasoning that we articulate with respect to trade secrets four and twenty-two appears to apply to the remaining alleged secrets that are the subject of defendants' pending motion. Thus our discussion should offer the parties insight into at least some aspects of the analysis the court could be expected to conduct, at least if the record were no fuller than it is now, with respect to the 13 alleged trade secrets that remain formally unaddressed in this opinion and order.

For the reasons set forth below, we DENY defendants' motion for partial summary judgment as to alleged trade secrets numbers 4 and 22.

---

numbers 4, 8, 10, 11, 15, 17, 19, 22, 23, 24, 27, 28, 29, 32, 33, 38, 39, 40, 41, and 42 (as identified in plaintiff's letter of October 16, 1991).

**2.** The alleged trade secrets with respect to which Intermedics elected not to seek relief in this litigation are numbers: 1, 2, 3, 6, 8, 10, 11, 18, 20, 29, 47, and 48.

## II. FINDINGS RELEVANT TO ALL THE SECRETS SUBJECT TO THIS MOTION

As we have analyzed the evidence and arguments that the parties have presented in connection with this motion, we have formed several potentially important conclusions about which we need to put the parties on notice.

First, to repeat something we have articulated earlier in this litigation, we find that plaintiff has chosen, in identifying/defining its trade secrets, to *equate* the phrase "an arrhythmia control device" with "an *implantable* defibrillator." For definitional purposes, we have accepted this equation by plaintiff, who will be bound by it, now and at trial. Because every one of plaintiff's alleged trade secrets includes this prefatory phrase ("an arrhythmia control device"), each secret shall be confined to the environment of *implantable* defibrillators. The secrets exist as secrets only when contemplated for use in an implantable setting. In other words, that implantable setting is an indispensable element of each secret. As we discuss in connection with alleged trade secret number 22, below, one upshot of this definitional equation is that defendants' documents will not be held to disclose a trade secret of plaintiff's if it appears from the documents that the matters disclosed were contemplated for use only in an external device.

Our second finding also has to do with the nature of the alleged trade secrets as presented by plaintiff in its final list (October 16, 1991). The trade secrets as presented by plaintiff represent *concepts at a relatively abstract level;* they consist of "*design ideas.*" They do not represent specific functioning embodiments. Thus they do not reach the mechanical details of how the design ideas are reduced to a working, functional part of an implantable defibrillator. For example, alleged trade secret number four, as identified by plaintiff, consists of an implantable defibrillator that includes a circuit that regulates the voltage of at least one output capacitor, which circuit includes a switched capacitor comparator. This trade secret extends only to the concept of achieving regulation of an output capacitor with a circuit that has a switched capacitor comparator, as part of an implantable defibrillator. We infer that there could be more than one (perhaps several) different specific mechanical means by which that goal of regulation could be achieved in this setting (i.e., in an implantable device and through a circuit with a switched capacitor comparator). Given the character of the trade secret itself (as a "design idea"), the fact that the documents on which defendants rely (in support of their motion) do not reveal the details of how regulation is to be achieved is irrelevant. In other words, the documents could disclose the alleged trade secret without disclosing the details of the mechanics by which the objective of regulation is to be achieved. Thus the failure to show mechanical details, by itself, would not be sufficient to defeat defendants' motion. In essence, the question in this setting would be: is the *idea of regulation* of the voltage of an output capacitor in an implantable defibrillator that includes a circuit that includes a switched capacitor comparator *perceivable* in the documents relied upon by defendants? The question is not: do the documents disclose details sufficient to determine whether the design idea of regulation would in fact work. By way of contrast, given our previous finding, it would be relevant if there were competent evidence (presumably expert testimony) from which a trier of fact rationally could find that matters actually disclosed in the documents relied on by defendants showed a design idea that *could* be made part of a functioning defibrillator *only* if that defibrillator were an *external* device, i.e., not implantable.

Counsel and the parties are hereby put on notice that during the trial of this case, the court's instructions to the jury will include the characterizations of the nature of the alleged trade secrets that are reflected in the preceding paragraphs.

We also find the evidence overwhelming that Intermedics knew, at the time of the Winstrom audit, that Ventritex' overriding business purpose and dominant economic goal was to develop an implantable defibril-

lator. See Supplemental Declaration of Michael B. Sweeney, executed July 21, 1992, and attachments thereto. Any suggestion that Intermedics believed, at any time, that more than a small percentage of Ventritex' economic life would revolve around external devices is wholly unpersuasive.

## III. LEGAL PRINCIPLES APPLICABLE TO ALL THE SECRETS SUBJECT TO THIS MOTION

Defendants move for summary judgment on the alternate grounds of res judicata and statute of limitations. We deal with each in turn.

### A. *Res Judicata*

■ Defendants argue that plaintiff's action with respect to the fifteen subject trade secrets is barred by the doctrine of res judicata because plaintiff voluntarily dismissed, with prejudice, an earlier action against defendants that allegedly covered these same 15 trade secrets.

On December 5, 1985, plaintiff filed a complaint for trade secret misappropriation against the defendants in this action in Texas state court. Ex. A to Salmon decl. (filed 3/18/92). The case was later removed to federal court and transferred to this district. Salmon decl. ¶ 2. Defendants counterclaimed, seeking a declaratory judgment that nothing protectable as a trade secret by Intermedics was reflected in their documents and product development plans. In an effort to resolve that earlier case short of trial the parties agreed to a procedure whereby William Winstrom, a former Intermedics employee, would conduct an informal audit of Ventritex to determine whether defendants had misappropriated plaintiff's trade secrets. Exs.. B, C to Salmon decl. Winstrom conducted the audit on Ventritex' premises on March 17 and 18, 1986, examining a range of documents related to defendants' product development efforts. Winstrom decl. (filed 6/22/92), ¶¶ 3, 9. After Winstrom made his confidential report, plaintiff decided to dismiss the action, with prejudice. In consideration of that dismissal, defendants also dismissed their counterclaim with prejudice. Judge Schwarzer signed the reciprocal stipulated dismissals on April 10, 1986. Ex. D to Salmon decl.

Defendants now argue that by April 10, 1986, they had "disclosed" or "used" the design concepts that comprise the fifteen alleged trade secrets that are the subject of this motion, that plaintiff could have pressed its misappropriation claims with respect to these alleged trade secrets to judgment in the prior action, and therefore that the April 10, 1986 dismissal with prejudice bars plaintiff, under res judicata principles, from pursuing now a misappropriation claim with respect to any of these 15 secrets.

■ Under California law (which governs substantive matters in this diversity action), we apply federal standards to determine the res judicata effects of the earlier federal court litigation. *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir.1982).

There is some tension between the parties' views about what the relevant federal standards are. While both parties agree that in *Costantini* the United States Court of Appeals for the Ninth Circuit articulated a four part test for resolving res judicata issues, plaintiff contends that this court need not undertake the kind of analysis reflected in *Costantini* because, according to plaintiff, the disposition of the res judicata portion of defendants' motion must be governed by the opinion of the United States Supreme Court in *Lawlor v. National Screen Service*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

In *Lawlor*, the Supreme Court held that the settlement of a previous antitrust action did not bar the plaintiff from bringing a later suit against the same defendants challenging alleged antitrust violations that were similar in some respects to those that had been alleged in the prior suit but that continued after the prior suit's dismissal. The Court found that res judicata barred plaintiff only from challenging that part of defendants' conduct that occurred before the prior dismissal; the Court permitted plaintiff to seek relief in the second action

based on conduct that occurred after the original dismissal.

*Costantini* applies a test first set forth by the Ninth Circuit in *Harris v. Jacobs,* 621 F.2d 341 (9th Cir.1980). Published 25 years after *Lawlor, Harris* declared (without mentioning *Lawlor)* that, under federal law, courts must apply a four part test to determine whether successive lawsuits involve a single cause of action for purposes of the bar of res judicata. That four part inquiry, according to *Harris* (and *Costantini),* included consideration of:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *Id.,* 621 F.2d at 343.

That court emphasized that, among these factors, the fourth is the most important, quoting with approval part of a passage from a Second Circuit opinion that we set forth here in full:

> The crucial element underlying all of these standards is the factual predicate of the several claims asserted. For it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies. *Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1234 (2d Cir.1977);[3] quoted in part in *Harris, supra,* 621 F.2d at 343.

The relationship between *Costantini/Harris* and *Lawlor* is not self-evident. When we first started thinking about this problem, we had considerable difficulty understanding how the *Costantini* and *Har-*

*ris* courts could have purported to set forth federal res judicata doctrine without even mentioning *Lawlor.* But gradually we have come to understand that the opinions are reconcilable, even complementary.

The *Lawlor* Court's res judicata analysis focused primarily on the parties' *conduct* (as opposed to focusing on substantive legal principles [4]), and, more particularly, on the relationship between the conduct that would have been the subject of the first suit and the conduct that would have been the subject of the second trial. Writing for a unanimous Court,[5] Chief Justice Warren's discussion of the res judicata issue emphasized the differences between the conduct that was alleged to have given rise to the first suit, on the one hand, and, on the other, the conduct that allegedly gave rise to the second. While there were similarities between the kinds of activities allegedly involved in the two actions, such that it was not patently irrational to suggest that the two suits involved "essentially the same course of wrongful conduct,"[6] there also were important differences. The Court pointed out that "new antitrust violations [were] alleged in the second action—deliberately slow deliveries and tie-in sales, among others," and that "there was a substantial change in the scope of the defendants' alleged monopoly...." *Id.* Because all of the conduct that gave rise to the second suit occurred after the termination of the first suit, and because what was challenged in the second suit included significant kinds of activities not alleged in the first, as well as a major increase in the extent of real world market power of the defendants, it necessarily followed (even though Chief Justice Warren's opinion does not make the point) that the evidence pres-

---

**3.** The court in *Expert Electric* also did not appear to rely upon or consider *Lawlor.*

**4.** The *Lawlor* court did not ignore the substantive policies that inform antitrust law, pointing out that construing res judicata doctrine to permit a second suit based on conduct that occurred after termination of the first action would help promote "the public interest in vigilant enforcement of the antitrust laws." *Id.,* at 329, 75 S.Ct. at 869. But this consideration did not play a dominant role in the court's analysis,

which revolved for the most part around a comparison of the timing, character, and extent of the conduct that would be the subject of the two litigations.

**5.** Mr. Justice Harlan did not participate in the consideration or decision of the case.

**6.** *Id.,* at 327, 75 S.Ct. at 868, quoting the district court, whose holding was being reversed.

ented in the second action would reach far beyond the evidence presented in the first suit. Similarly, given the differences in the timing, extent, and character of the defendants' conduct, Chief Justice Warren and his colleagues very likely would have rejected the suggestion that the "two suits [arose] out of the *same transactional nucleus* of facts" (the most important of the *Costantini/Harris* factors).

Thus, while it is curious that *Costantini* and *Harris* did not mention *Lawlor*, and while the earlier opinion from the Supreme Court is neither as conceptually ambitious nor as apparently conceptually tidy as the more recent opinions from the Ninth Circuit, the fundamental thrust of analysis in *Lawlor* has much in common with that in *Costantini* and *Harris*. Both the *Lawlor* and the *Costantini/Harris* approaches refuse to be dominated by abstract conceptual considerations (e.g., arguments about the definition or the character of the "right" that plaintiff is attempting to vindicate or of the "wrong" that defendants alleged committed)[7]; instead, both approaches insist that such semantic concerns give way to an analysis dominated by a focus on the practical relationship between the real world events that are the principal subjects of the litigations. Moreover, even though there is no hint in *Costantini* or *Harris* that their authors were aware of *Lawlor*, we suspect that the more recent opinions' emphasis on the practical (rather than the abstract or theoretical) reflects, albeit indirectly, the influence of the kind of reasoning (real-world focused) that is reflected in the earlier opinion.

Our conviction that the two approaches reflected in these opinions are complementary is reinforced by our perception that a principled application of the *Costantini/Harris* test to the circumstances presented in *Lawlor* would result in the same conclusion that Chief Justice Warren and his colleagues reached in the earlier case. As we indicated above, we do not think that the two suits in *Lawlor* arose "out of the same transactional nucleus of facts" or that "substantially the same evidence [would have been] presented in the two actions." These two factors likely would control the outcome, even if it were arguable that the two suits involved "infringement of the same right" (as defined in that case by the antitrust laws) and that rights or interests established in the prior judgment might be destroyed or impaired as a result of the prosecution of the second action.

These thoughts define the context in which we consider defendants' efforts to distinguish *Lawlor* from the case at bar and to argue that the reasoning reflected in that opinion should not defeat their attempt to use res judicata to prevent plaintiff from seeking relief in this action based on defendants alleged misappropriation of the 15 secrets that are the subject of this motion. Defendants suggest that *Lawlor* is inapposite because in that case the substance of antitrust laws defined the nature of the rights in issue quite differently than the substance of California trade secret law defines the nature of the rights in issue in the litigation at bar. Defendants argue that the reason the *Lawlor* Court refused to find that res judicata barred the second action is that *substantive federal antitrust law* defined post-judgment continuation of the kind of conduct that was alleged in the first action to constitute a new (separate) cause of action. In sharp contrast, defendants contend, substantive California trade secret law makes it very clear that "continuing acts of trade secret misappropriation do not constitute separate torts which may be sued upon as separate causes of action." Defendants' Reply Memorandum filed August 4, 1992, at 2–3.[8]

---

7. In *Lawlor*, for example, the Court insisted (1) that the question of whether the two suits could be said to involve "essentially the same course of wrongful conduct" was not "decisive" and (2) that the first action would not act as a bar to the second regardless of "whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort". *Lawlor*, at 327 and 328, 75 S.Ct. at 868.

8. Defendants cite *Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 523–24 (9th Cir.1990); *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1345–46; *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288, 292–93 (9th

There are several difficulties with this line of reasoning. The most important is that it ignores both the essence of and specific language in *Lawlor*. As noted above, Chief Justice Warren's opinion for the Court expressly rejected the argument that resolution of the res judicata issue should turn on "whether the defendants' conduct [is] regarded as a series of individual torts or as one continuing tort." *Lawlor*, at 328, 75 S.Ct. at 868. Thus the Court expressly rejected the idea that how abstract principles of substantive law might define rights, or the occasions on which a suit could be brought, should control res judicata analysis. Instead, the Court's analysis in *Lawlor* had a decidedly practical cast, comparing, as we have noted, the timing, extent, and character of the *conduct* in issue in the two suits.

Defendants' suggestion that how substantive California law chooses to define trade secret rights is key to res judicata analysis under federal law also flies squarely in the face of the explicit insistence by the *Costantini* and *Harris* courts that the most important of the factors to be considered in res judicata analysis is whether "the two suits arise out of the same transactional nucleus of *facts*"[9] (emphasis added). While the *Costantini* and *Harris* courts acknowledge that the question of whether "the two suits involve infringement of the same right" (presumably as defined by the relevant substantive law) should be taken into account in res judicata analysis, the fact that this issue represents only one of four factors that *Costantini* and *Harris* compel courts to consider, and that one of the *other* factors is explicitly deemed more important, makes it quite clear that how rights are defined by sub-

stantive law is a secondary consideration in this analytical environment. Notably, the *Costantini* court explicitly declared that "a mere change of legal theory [in that case from federal antitrust law to state unfair competition law] does not imply a new cause of action." *Costantini*, at 1202, n. 9.

Insisting, as defendants do, that continuing or repeated misappropriations of an alleged trade secret can give rise to only a single cause of action for purposes of res judicata because of how substantive trade secret law defines the right or interest that is protected would make wholly irrelevant two of the four *Costantini* factors and would contradict squarely the *Lawlor* approach. It also would elevate formalism over functional analysis and revitalize a kind of sterile circular legal reasoning that courts have gone to great lengths to escape.

We also note in passing that the cases defendants have cited in support of the proposition that continuing or separately repeated misappropriations of the same trade secret can constitute only one cause of action do *not* purport to define the phrase "cause of action" in the context of *res judicata* analysis. Rather, the cases on which defendants rely address only *statute of limitations* issues. It is far from clear to us that it is analytically reliable to import, wholesale, into our thinking about res judicata the notions that courts have developed for the different purpose of resolving statute of limitations issues. The fact that the phrase "cause of action" appears in both settings does not mean that it is defined identically in both.

Our skepticism on this score is reinforced by the fact that the constellations of policy

---

Cir.1969), all of which held that, for statute of limitations purposes, a cause of action for trade secret misappropriation arises only once. *See also, Davies v. Krasna*, 14 Cal.3d 502, 511–15, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975). For example, the court in *Monolith* held:

> California does not treat trade secrets as if they were property. It is the relationship between the parties at the time the secret is disclosed that is protected.... The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravat-

ed. The cause of action arises but once, and recovery for the wrong is barred within two years thereafter unless the statute has been effectively tolled. *Monolith, supra*, 407 F.2d at 293.

9. Elsewhere in their papers defendants explicitly acknowledge that this fourth factor is the most important in the *Costantini* analysis and insist that this court's analysis of the res judicata issues be governed by the law as articulated in *Costantini*.

considerations that inform doctrine in the two arenas are by no means identical. While concern about repose plays a role in both settings, there are other policies that are unique to one setting or the other. As the California Supreme Court pointed out in an analogous context in *Davies, supra,* footnote eight, the "fundamental purpose" of the statute of limitations "is to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh." 14 Cal.3d at 512, 121 Cal. Rptr. 705, 535 P.2d 1161. It is not clear that this consideration plays any meaningful role in res judicata thinking. A primary purpose of the doctrine of res judicata, on the other hand, is to prevent parties (as well as courts) from suffering the unreasonable expense of repetitive litigation by pressuring litigants to consolidate into one proceeding as many contemporaneously knowable and reasonably related predicates for relief as possible. It is not clear what role this consideration plays in statute of limitations thinking. To bring these points closer to home, we note that while viewing multiple misappropriations of a single trade secret as constituting only one cause of action for statute of limitations purposes appears to serve the evidence-gathering policy (by making it more likely that parties will have access to the evidence necessary to determine whether the matter in question was indeed a trade secret prior to the initial misappropriation), it is much less clear that such a view would fairly serve the res judicata policy of preventing *unreasonably* repetitive litigation (where, for example, the scope and character of a defendant's misappropriation changes considerably after settlement of the earlier litigation).

■ For all the reasons set forth above, we conclude that federal res judicata doctrine requires us to focus primarily on the factual and evidentiary relationship between the earlier and the current suits, giving the legal relationship between the claims only secondary consideration. While defendants argue that the record is

sufficient to make the requisite comparison, we disagree. Defendants have not presented anything approaching a systematic comparison of the facts, conduct, and evidence that the two suits would involve. Plaintiff has insisted throughout that virtually all of the conduct that it will try to prove in the trial of this action occurred after the dismissal of the first action.[10] We intend to hold plaintiff to that position. If virtually all of the factual bases for plaintiff's right to relief arose after April 10, 1986, we fail to see how "substantially the same evidence" would be presented in the two actions. Similarly, if the conduct and events on which plaintiff will focus in this trial occurred after the first dismissal it is not at all clear that it would be fair to hold that the two suits "arise out of the same transactional nucleus of facts." To conclude otherwise would require us to replace evidence and facts in our analysis with abstract reasoning about the character of the right or relationship that is protected by California trade secret law. We would be constrained to reason that the doctrine of res judicata bars all subsequent misuse of a trade secret, no matter how extensive or outrageous, if, before the first dismissal, there had been even the slightest and most technical invasion of the protected interest, e.g., by one embryonic disclosure made without permission. We decline to follow this course because federal law of res judicata prohibits us from doing so.

We also emphasize that this is a motion for summary judgment. Because defendants' motion is not accompanied by evidence about events occurring after the April 10, 1986 dismissal, we have precious little basis for comparing the factual interrelatedness of the claims plaintiff presently asserts with those plaintiff could have asserted in the prior action. In this setting it would not be appropriate for us to speculate about what the proof will be at trial.

Since it is by no means clear that essentially the same real world conduct will be

**10.** Excepting, presumably, the issues of whether the alleged trade secrets were trade secrets in the first place and whether the individual defendants had access to them during their tenure with the plaintiff company.

**44**

litigated here that would have been litigated in the 1985 action, we DENY defendants' motion for partial summary judgment to the extent that it is based on the doctrine of res judicata.

### B. *Statute of Limitations*

▆ Defendants also argue that plaintiff's pursuit of this action with respect to the 15 subject trade secrets is barred by the applicable statute of limitations. California Civil Code § 3426.6, which was enacted in 1985, provides as follows:

An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim.

Thus, with respect to any given trade secret, California law requires plaintiff to bring an action within three years after plaintiff discovered or should have discovered defendants' initial misappropriation of that trade secret (regardless of whether the initial misappropriation is characterized as a use of the trade secret or merely as a disclosure of it). *Ashton–Tate, supra,* 916 F.2d at 523–24; *see also Whittaker, supra,* 736 F.2d at 1345; *Monolith Portland Midwest, supra,* 407 F.2d at 292–93.

We find that plaintiff, through the exercise of reasonable diligence, should have discovered at least "disclosure" of any trade secret that was visible in the Ventritex documents that were made available to Winstrom (who was serving as plaintiff's agent) during the audit on March 17 and 18, 1986. Plaintiff cannot contend that time constraints prevented Winstrom from discovering secrets reflected in the Ventritex documents; Winstrom elected to use only two of the four days he was given for the audit. Moreover, he was allowed to talk to Sweeney, Pless, and Philip Ball during the audit "to clarify any technological information or details concerning Ventritex's proposed implantable defibrillator." Exs. B, C to Salmon decl. Winstrom in fact did speak at length with Pless during the audit. Winstrom decl. at ¶¶ 3–4. No

evidence has been presented that defendants engaged in any fraud or concealment during the audit process. We thus find that no reasonable juror could conclude other than that plaintiff, through reasonable diligence, should have discovered any of the alleged trade secrets that were disclosed in documents Winstrom could have seen during the audit process.

It follows that, if defendants can establish that an alleged trade secret was disclosed in documents available to Winstrom during the audit on March 17–18, 1986, they are entitled to prevail on their motion for partial summary judgment with respect to that trade secret, since more than three years passed between the March, 1986 audit and plaintiff's filing of the present suit in 1990.

Before specifically addressing trade secrets nos. 4 and 22, we note our puzzlement that plaintiff did not address or even acknowledge the statute of limitations issue in its opposition to defendants' motion for summary judgment. We might infer, from the so-called "fairness" arguments that plaintiff's counsel makes in his supplemental submission filed July 22, 1992, that plaintiff's counsel interpreted this court's statements during the May 19, 1992 discovery hearing as limiting defendants' motion to res judicata issues and precluding defendants from pursuing their motion on statute of limitations grounds. We hope this is not the case, as we find such a strained interpretation to be wholly unreasonable. This court clearly issued no order, written or oral, that in any way purported to reformulate defendants' motion as filed. During the May 19, 1992 hearing, the court merely asked defendants a few questions about the nature of their motion in order to equip the court to determine whether plaintiff needed additional discovery to reply to the motion. Our reference to having attempted to articulate a "skinnier version" of the summary judgment motion (see page 34 of the transcript attached to Olson's July 14, 1992 declaration), when read in context, clearly referred to our distinguishing a motion made on res judicata grounds from a motion that might be made on such substantive grounds as whether the alleged

trade secrets had entered the public domain (pp. 25–26 of the transcript). No statement made during the court's conversation with defendants' counsel can reasonably be construed as an order restricting defendants from pursuing the alternate ground of statute of limitations, a ground that defendants clearly set forth in their moving papers and never withdrew.[11]

*ALLEGED TRADE SECRET NUMBER 4:* AN ARRHYTHMIA CONTROL DEVICE HAVING A SWITCHED CAPACITOR COMPARATOR AS PART OF A CIRCUIT WHICH REGULATES AT LEAST ONE OUTPUT CAPACITOR VOLTAGE.

█ Defendants claim that this alleged trade secret is fully disclosed in documents that are Bates stamped V104895, V104977, V104978, V104979, V104980, and V104981. Defendants have not provided evidence, however, that establishes that these documents were available to Winstrom during the audit on March 17–18, 1986. With the exception of the first one (V104895), the most defendants can establish is that the documents were generated sometime between March 7, 1986 and April 9, 1986. See Cello decl. (filed July 21, 1992) ¶¶ 3–8.[12] Thus, undisputed facts do *not* establish that these documents were available to Winstrom at the time of the audit. There being no other basis in the record to determine that plaintiff discovered or, by exercise of reasonable diligence, should have discovered these documents more than three years before filing suit, we DENY defendants' motion for summary judgment on statute of limitations grounds with respect to Alleged Trade Secret # 4.

*ALLEGED TRADE SECRET NUMBER 22:* AN ARRHYTHMIA CONTROL DEVICE HAVING A CIRCUIT DESIGN WHICH UTILIZES A SINGLE CAPACITOR BANK TO PRODUCE A MULTIPHASIC OUTPUT WAVEFORM.

█ Unlike the situation with alleged trade secret number four, it is clear that the documents that defendants contend "disclose" trade secret number twenty-two were generated before the Winstrom audit and were available to him.[13] If there were no genuine dispute that these documents in fact disclosed this trade secret, defendants would be entitled to summary judgment with respect to this secret on the basis of the statute of limitations.

We decline to grant defendants' motion on the record before us, however, because we are not confident that there is no genuine dispute about the clearly material factual issue of whether the documents on which defendants rely disclose this alleged trade secret. As noted above, plaintiff insists that this design idea, like all the others it seeks to protect in this litigation, exists as a trade secret *only* in the context of an *implantable* defibrillator; that is, plaintiff contends that the circuit design using a single capacitor bank to produce a multiphasic output waveform is a protectable trade secret only when part of an implantable defibrillator.

The Brubaker and Pless declarations on which defendants rely provide competent evidence that three Ventritex documents that were available to Winstrom during his

---

11. We also are unimpressed with plaintiff's argument that this court purported to distinguish "use" from "disclosure" during the May 19 hearing and that defendants' moving papers did not adequately notify plaintiff that defendants were basing their motion on *disclosures or* uses of the alleged trade secrets. There are at least two places in their opening memorandum where defendants explicitly use both terms. Moreover, it is simply incredible to suggest that counsel for plaintiff believed that defendants intended to limit the scope of their motion in such a self-defeating manner, especially given the indisputably embryonic state of Ventritex's product development efforts in the spring of 1986. We hereby warn counsel for plaintiff that we are not pleased with his efforts to claim that he

justifiably relied on strained interpretations of statements by this court taken out of context.

12. Although ¶ 3 of the Cello declaration establishes that document V104895 was generated by December 13, 1985, defendants do not contend, and the evidence does not establish, that this document by itself discloses Alleged Trade Secret # 4. Rather, of these documents, we find the most important to be documents V104977 and V104980. See Brubaker decl. (filed March 18, 1992), pp. 4–7.

13. These are Bates stamped documents V105009, V105065, and V105066. As to the date of their generation, see Cello decl. at ¶¶ 27–29.

audit disclose a circuit design that utilizes a single bank of capacitors to produce a multiphasic output waveform, but no evidence adduced by defendants directly contradicts the assertions by plaintiff's expert, Dr. Gregory Kovacs, that "the components and design features shown in these circuits are incompatible with implantable device design" (Kovacs Decl. of June 19, 1992, at 16) or that "the circuits shown are not suitable for use in an implantable device." (*Id.*, at 18). Neither the Brubaker nor any of the Pless declarations squarely assert that the circuits described in these documents could or were intended to be used, as presented or if directly miniaturized, in an implantable device. And while Mr. Pless' Declaration of June 2, 1992, indicates (at page five) that the three documents in question were connected in some sense with both the external and the implantable devices on which Ventritex was working, it also appears from that Declaration (at page four) that the circuits reflected in these documents were not "integrated" and therefore not candidates for miniaturization, a crucial prerequisite for inclusion in an implantable device.[14]

Defendants understandably complain about the quality of the support for the opinions by Dr. Kovacs, plaintiff's expert, that the circuits reflected in these documents were not suitable for use in or compatible with design of an implantable device. Defendants challenge Dr. Kovacs qualifications to offer such an opinion, noting, among other things, that his Declaration (executed June 19, 1992) is vague about the extent and character of his familiarity with devices used to treat cardiac arrhythmias. While Dr. Kovacs provides no substantiating or elaborating information on this point, he contends unequivocally (and without contradiction on this record) that he has "worked extensively on the design and fabrication of implantable devices which functionally stimulate peripheral nerves and record nerve impulses" and

that he has "designed integrated circuits" for such devices. Given these assertions, and the fact the Mr. Kovacs has both a Ph.D. in electrical engineering and an M.D., the court cannot find that it is indisputable that Dr. Kovacs is not qualified to offer the opinions in question.

Defendants also argue that the bases for the opinions in issue here by Dr. Kovacs are so anemic and generalized that a rational trier of fact would be compelled, as a matter of law, to ignore those opinions. While we are by no means overwhelmed with the specificity of the support for his views, we decline, at this juncture, to conclude that the law mandates that they be ignored. First, we point out that Dr. Kovacs offered, in the earlier sections of his Declaration, considerable support for his opinion that there are a great many important design constraints that attach to implantable devices, and the circuitry that runs them, that do not attach to external devices. Certainly his Declaration offers evidence apparently competent to support a finding that there are very significant differences between the design parameters for external and for internal devices of this sort (e.g., efficiency considerations make components that might be useable in one environment unusable in the other). Perhaps most significantly, he also insists that many of the circuits disclosed in the relevant Ventritex documents "simply could not be miniaturized to the extent necessary for use in an implantable device." Kovacs Decl. of June 19, 1992, at page 6. While Dr. Kovacs does not set forth the reasoning that supports this view, his education and background appear to provide him with a basis for holding it. Given that education and background, as well as the fact that there is nothing on the face of his apparently relevant general discussion of the issues before us that would discredit him as a source of competent evidence, and given the failure of the declarations submitted by defendants to squarely contradict

---

14. Mr. Pless seems to concede that some circuits, those that use "off-the-shelf components," do not lend themselves to miniaturization. We infer that one of the major tasks Ventritex faced in attempting to develop an implantable defi-

brillator was to *redesign* circuits that could deliver the desired service to the heart but only through an external device. See Pless Decl. of June 2, 1992, at para. 3, p. 2.

his opinions, we decline to infer that he could not support his views with a level of specificity that would prevent direction of a verdict in favor of defendants.

We add, however, that we assume that counsel for defendants will depose Dr. Kovacs soon (well in advance of the November trial) and, during that deposition, will question him about the more specific bases for his opinions. Should deposition questioning (or other discovery) expose that he can articulate no more specific bases for his reasoning than is set forth in his June 19, 1992 Declaration, the court will permit defendants promptly to reactivate their motion for partial summary judgment as it relates to trade secret number twenty-two.

For the reasons set forth above, we DENY defendants motion for partial summary judgment on the grounds of res judicata and statute of limitations.

IT IS SO ORDERED.