Filed 10/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | B289709 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC532708) |
| v. | |
| MATTEL, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Carolyn B. Kuhl, Judge.  Affirmed.

Stris & Maher, Peter K. Stris, Kenneth J. Halpern, Douglas D. Geyser, John Stokes; and Benjamin C. Johnson for Plaintiff and Appellant.

Quinn Emanuel Urquhart & Sullivan, John B. Quinn, Michael T. Zeller, B. Dylan Proctor, Daniel C. Posner and Kathleen M. Sullivan for Defendant and Respondent.

_____

## SUMMARY

The trial court granted summary judgment on the complaint because it was barred by the statute of limitation. We affirm.

Litigation between plaintiff MGA Entertainment, Inc. and defendant Mattel, Inc. began in the federal courts in 2004, with disputes over ownership of the Bratz line of dolls and claims of copyright infringement. In that litigation, in August 2007, MGA served a discovery request for documents relating to Mattel's efforts to obtain MGA's trade secrets and information about unreleased products and product development, including by Mattel trying to gain access to MGA showrooms or toy fair displays on false pretenses.

Ten days after serving this document request, MGA asserted a factually detailed affirmative defense in the federal litigation, alleging Mattel's unclean hands. MGA alleged Mattel engaged in all sorts of unseemly conduct, including "monitoring, 'spying on' or gaining knowledge of MGA's trade secrets, non-public information, nonpublic activities, unreleased products, and product development," and "gaining access, or attempts to gain access, to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false pretenses."

Three years and three days later, MGA asserted a "counterclaim-in-reply" in the federal litigation, alleging a cause of action for misappropriation of trade secrets under the California Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.). MGA claimed Mattel employees used fake credentials and misrepresented themselves as retailers to gain access to MGA displays of as-yet-unmarketed products at private showrooms at industry toy fairs. Mattel raised the statute of limitation defense

(three years), but the district court found MGA's claim was a compulsory counterclaim-in-reply and related back to Mattel's January 12, 2007 filing of its answer and counterclaims. As we explain below, MGA's reliance on this ruling was misplaced.

In January 2011, MGA obtained a verdict on its trade secret misappropriation claims of more than $80 million, and the district court awarded an equal amount in punitive damages for the "willful and malicious" misappropriation. Unfortunately for MGA, the Ninth Circuit reversed the district court's ruling that MGA's claim was a compulsory counterclaim-in-reply. The Ninth Circuit vacated the verdict and directed the district court to dismiss MGA's trade secret claim without prejudice. (*Mattel, Inc. v. MGA Entertainment, Inc.* (9th Cir. 2013) 705 F.3d 1108, 1110-1111.)

MGA then filed its complaint for misappropriation of trade secrets in the superior court. Mattel filed a motion for summary judgment, contending the three-year statute of limitation had run by the time MGA filed its trade secret claim in federal court on August 16, 2010.

We agree with the trial court that, under California law, the same suspicions that allowed MGA to request discovery and plead the unclean hands defense in the federal court in 2007 were sufficient to trigger the statute of limitation.

## FACTS

We have already described the crux of the case. We discuss additional facts below in light of the California rule that the statute of limitation begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff proves a reasonable investigation at that time would not have revealed a factual basis for the claim.

3

## 1.    The Federal Litigation

Mattel filed an unopposed request for judicial notice of various documents filed in the federal litigation, all of which appear in the parties' respective appendices.  We grant the motion.

MGA contends that, despite its assertions in August 2007, both in its unclean hands defense and its discovery request in federal court, the statute of limitation did not begin to run until almost three years later, on July 12, 2010.  On that day, deposition testimony from Salvador Villasenor, a former Mattel employee (until 2006) who oversaw and directed Mattel's "market intelligence" activities, "blew the case open."

Mr. Villasenor testified that, beginning in 1992, Mattel employees had obtained catalogues of products made by Mattel's competitors by visiting their private showrooms at toy fairs, gaining entry by creating fictitious business cards and presenting themselves as toy store owners.  Mr. Villasenor engaged in those activities himself for six or seven years, beginning in 1999, with the knowledge of company executives, and he identified others who had also done so for Mattel (although he denied he had done so in any MGA showrooms).

Further, MGA points out that although it requested documents in November 2006 relating to whether Mattel had access to any displays or showrooms containing any of MGA's Bratz lines, Mattel did not produce relevant documents until early 2010, and the documents produced then were silent about how Mattel acquired MGA information.  (Mattel claims such documents were irrelevant because at the time there was no trade secret claim in the litigation.)

4

Only after the Villasenor deposition did Mattel begin to produce "smoking gun" documents, including Mattel's toy fair reports, a guide directing employees on how to create false identities and businesses to gain access to competitors' showrooms, a December 2005 e-mail from Mr. Villasenor expressing fear that his actions could expose him to personal criminal liability, and so on.

As already noted, just a month or so after the Villasenor deposition, MGA filed its trade secret misappropriation claim in the federal litigation. Before the Villasenor deposition, MGA alleged, several Mattel executives who were aware of the illegal activities "gave misleading or untruthful testimony in order to suppress it and keep it from coming out in this [the federal] litigation."

The jury in the federal litigation found that Mattel had misappropriated 26 trade secrets owned by MGA (of the 114 trade secrets MGA claimed Mattel had misappropriated from private toy fair showrooms). (See *Mattel, Inc. v. MGA Entertainment, Inc.* (C.D.Cal. Aug. 4, 2011, No. CV 04-9049 DOC (RNBx)) 2011 U.S.Dist.Lexis 85928, pp. 16-18.) At the trial, several of Mattel's senior executives acknowledged the conduct of Mattel's employees was improper and had been approved at senior levels of the corporate hierarchy. (*Id.* at p. 47.)

## 2.	This Case

The reversal of the federal jury's verdict brings us to this lawsuit and Mattel's motion for summary judgment. None of the facts we have related so far was disputed. The parties agree the relevant dates are MGA's August 3, 2007 discovery request; its August 13, 2007 unclean hands defense; and its August 16, 2010 filing of the trade secret misappropriation claim in federal court.

5

(The parties agreed, for purposes of the summary judgment motion, that the statute of limitation was tolled as of August 16, 2010.)

### a. Mattel's evidence

Mattel presented evidence that MGA had reason to suspect trade secret misappropriation more than three years before its August 16, 2010 federal "counterclaim-in-reply" alleging misappropriation of trade secrets under California law. In addition to the explicit language in MGA's discovery request and unclean hands defense, we discuss below Mattel's evidence that is pertinent to our analysis.

Mattel cited deposition testimony from Paula Garcia, an MGA executive who had previously worked at Mattel. Ms. Garcia testified that she had seen Mr. Villasenor at the front of an MGA showroom at a toy fair in New York. She told Isaac Larian, MGA's chief executive officer, that she had seen Mr. Villasenor, and that she believed he was a Mattel employee. She did not remember the year, but she did *not* believe it happened in 2006 or thereafter. Other evidence established it was before 2006. Ms. Garcia responded affirmatively when asked whether "sometime later, *years later* [after the showroom incident], you saw Mr. Villasenor on the MGA campus . . . interviewing for a job with MGA; correct?" (Italics added.) It was undisputed that Mr. Villasenor interviewed with MGA in late 2006 or early 2007.

Ms. Garcia was "definitely" surprised to see Mr. Villasenor, and that is why she told Mr. Larian about it. She was concerned because it appeared that a Mattel employee had obtained access to an MGA showroom. She thought it was "wrong for [Mr. Villasenor] to be there" if he was a Mattel employee, and she

6

believed he was a Mattel employee. When she was asked, "So you believe that Sal Villasenor, a Mattel employee, had seen unreleased product, MGA product, that you considered to be highly confidential; is that correct?" Ms. Garcia answered, "Yes." It is undisputed that Mr. Larian "reported to MGA's lawyers the information Ms. Garcia gave him." Also, in discovery MGA admitted "that Paula Garcia once recognized Sal Villasenor in an MGA showroom prior to August 3, 2007."

In November 2003, Mr. Larian responded to a question from a reporter about why MGA had declined to participate in a fall 2003 toy fair, instead opting to do his own previews. Mr. Larian wrote, among other reasons: "we have found that at these shows the [imitators] (including the top toy companies) attend and get into your showroom pretending to be a member of the press or a 'customer' to learn what you are doing to knock you off earlier. We wanted to delay that a bit."

MGA's own verified interrogatory responses stated that, "[o]n or about August 29, 2003, Isaac Larian expressed concern that Mattel might obtain confidential information about unreleased MGA products previewed in MGA's showroom." On February 10 and 11, 2004, Mr. Larian "considered the possibility that Mattel might obtain confidential information about unreleased MGA products at the 2004 New York Toy Fair." On January 22, 2007, Mr. Larian "considered the possibility that Mattel might obtain confidential information about unreleased MGA products at the 2007 Funtastic Toy Fair." On January 31, 2007, Mr. Larian "considered the possibility that Mattel might obtain confidential information about unreleased MGA products at the 2007 Mexico Toy Fair."

### b. MGA's response

MGA observed the evidence it cited in its verified interrogatory responses as the factual basis for its unclean hands defense (Mr. Larian's expressed concerns, recited just above) "does not state that Mattel was using fake identification to enter MGA showrooms." MGA contends it "considered multiple possibilities as to whether and how Mattel might be gaining access to MGA's product information, including access through legal means."

The bulk of the evidence MGA offered was directed to its claim that Mattel's fraudulent concealment of its wrongdoing tolled the statute of limitation. MGA asserted that in 2007, Mattel improperly withheld documents during discovery, not producing them until 2010, and that from 2008 to 2010, "Mattel's executives lied under oath during depositions." MGA discovered the lies only after the Villasenor deposition in July 2010, when Mattel finally produced documents, and at the later trial, as noted above. MGA concluded that, as a result of Mattel's fraudulent concealment, "MGA was unable to discover the facts until September 2010."

### DISCUSSION

Our review of the trial court's ruling on summary judgment is de novo.

An action for misappropriation of trade secrets "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." (Civ. Code, § 3426.6.)

The California rule on delayed discovery of a cause of action is the statute of limitation begins to run "when the plaintiff has reason to suspect an injury and some wrongful cause . . . ." (*Fox*

8

*v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 803 (*Fox*).) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. . . . So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111 (*Jolly*).)

Finally, it is firmly established " 'that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.' " (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931 (*Bernson*).) As the court observed in *Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1460 (*Rita M.*), the doctrine of fraudulent concealment for tolling the statute of limitation " 'does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' "

1.      **MGA's Contention It Did Not Discover Mattel's Misappropriation of 114 Trade Secrets Until 2010**

MGA takes two approaches to its first argument on appeal.

In its opening brief, MGA contends the trial court's "fundamental error was failing to recognize that MGA did not discover *all* of the misappropriations at issue, simply because it may have discovered *some* of them." MGA continues: "[E]ven if MGA learned that Mattel had infiltrated a single toy fair on one occasion, it was improper to conclude . . . that this necessarily put MGA on notice that *different* trade secrets displayed at *different* toy fairs in *different* years were misappropriated." MGA's second

approach, reemphasized in its reply brief, is that "MGA did not discover *a single one* of Mattel's 114 misappropriations until 2010," when Mattel turned over toy fair reports from 2000-2004 "rife with confidential competitive information."

Neither of these approaches survives scrutiny, because they both rely on misstatement or misapprehension of California law on the accrual of the statute of limitation.

### a. The "114 distinct 'injuries' " contention

MGA did not present the trial court with its theory that each of the 114 alleged trade secret misappropriations was a distinct claim, so that discovery of one misappropriation (say, "at the New York Toy Fair in 2000") would not "put MGA on notice" of a misappropriation "at the Hong Kong Toy Fair in 2004." Mattel contends MGA's new theory is forfeited. We will forego consideration of the forfeiture issue, as we find it clear that MGA's theory of distinct injuries has no application in this case.

MGA asserts the statute of limitation "runs separately from the discovery of each distinct injury," and that *Fox* stands for the proposition that claims "involving distinct injuries accrue at the time the plaintiff discovers each of those distinct injuries." *Fox* does not stand for that proposition, and did not involve "distinct injuries." *Fox* involved a single injury to the plaintiff caused by "distinct types of wrongdoing." (*Fox, supra,* 35 Cal.4th at p. 814.) In *Fox*, the court held that "if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing [medical malpractice] when the injury was actually caused by tortious conduct of a wholly different sort [products liability], the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." (*Id.* at p. 813; *ibid.* [the discovery rule applies "to delay accrual of a products liability cause of

10

action even when a related medical malpractice claim has already accrued, unless the plaintiff has reason to suspect that his or her injury resulted from a defective product"].)

This is not a case like *Fox*, which involved distinct types of wrongdoing. Nonetheless, building on its misstatement of what *Fox* said, MGA contends that "[t]he same is true in the context of trade secret cases involving multiple, distinct misappropriations." MGA cites only one federal district court opinion that correctly found, "with respect to any given trade secret, California law requires plaintiff to bring an action within three years after plaintiff discovered or should have discovered defendants' initial misappropriation of that trade secret." (*Intermedics, Inc. v. Ventritex, Inc.* (N.D.Cal. 1992) 804 F.Supp. 35, 44 (*Intermedics*).) The quoted statement merely reflects what Civil Code section 3426.6 already tells us: that the claim must be brought within three years after the misappropriation is discovered or should have been discovered. *Intermedics* offers no guidance on the point at issue here, a point MGA persistently ignores: when did MGA have "reason to suspect" that Mattel was "gaining knowledge of MGA's trade secrets" and "gaining access . . . to MGA showrooms . . . on false pretenses"? It did so – for all the 2000 to 2006 alleged misappropriations – when it had enough facts to assert, as it did on August 13, 2007, its affirmative defense of Mattel's unclean hands *on that very basis*.

MGA insists that when it filed its affirmative defense, it was "*at most*" on notice of only two trade secrets Mattel obtained at a 2000 toy fair. Similarly, MGA says that: "To be sure, seeing Villasenor at one toy fair on one occasion might have placed MGA on inquiry notice as to whatever trade secrets were being displayed *at that toy fair*." We simply cannot agree with MGA's

compartmentalization of its suspicion of wrongdoing. A defendant in these circumstances cannot don blinders to avoid the accrual of the statute of limitation.

We reject the notion that, even if MGA learned Mattel infiltrated one toy fair, it had no reason to suspect a similar wrongdoing occurred at any other toy fairs. That defies common sense, and it ignores the undisputed evidence that Mr. Larian expressed concern – in 2003, and again in 2004, and again in 2007 (see pp. 7-8, *ante*), that such wrongdoing might occur at toy fairs in those years.

### b. MGA's claim it did not discover any trade secret misappropriation until 2010

MGA's other formulation of its argument is that "MGA did not discover *a single one* of Mattel's 114 misappropriations" until August 2010, when Mattel turned over documentary evidence of the misappropriations (its toy fair reports " 'rife with confidential competitive information' "). This formulation suffers from the same underlying flaw as the other: it ignores the standard for accrual of the statute of limitation.

The standard for accrual of the statute of limitation under the discovery rule is *not* the receipt of documentary evidence of misappropriations. The question is when MGA was " 'on notice of a potential claim.' " (See *Rita M., supra,* 187 Cal.App.3d at p. 1460.) *Jolly* makes that perfectly clear when the court tells us that a plaintiff need not be aware of "specific 'facts' necessary to establish the claim," and "that is a process contemplated by pretrial discovery." (*Jolly, supra,* 44 Cal.3d at p. 1111.) As the statute itself tells us, the question is not when MGA actually discovered all 114 misappropriations; it is when MGA by the exercise of reasonable diligence should have discovered Mattel

engaged in misappropriation. (Civ. Code, § 3426.6; see *Fox, supra,* 35 Cal.4th at p. 807 ["A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' "].) Once MGA had "reason to suspect an injury and some wrongful cause" (*Fox,* at p. 803), the statute of limitation began to run.

At the risk of repetition, we point out our rejection of a similar misguided argument in *Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793. There, after reciting the *Jolly* principles (*id.* at p. 818), we rejected the plaintiffs' claim they did not learn the facts constituting the defendants' wrongful act until documents evidencing that conduct were produced in another case. (*Id.* at pp. 819-820.) We said: "While we accept these assertions as true, they do not affect the accrual of the statute of limitations. That is perfectly plain from *Jolly* . . . . Plaintiffs do not and cannot say they had no suspicion of wrongdoing by defendants . . . ; their own statements show otherwise. Further, their claims that 'the discovery rule must prevent the statute of limitations from running until [they] had sufficient evidence to support their prima facie case' is likewise unsupported by any pertinent legal authority, and is affirmatively contradicted by *Jolly*." (*Bergstein,* at p. 820.)

In the end, MGA simply cannot explain away the assertions it made in August 2007 in its unclean hands defense. The very same suspicions based on the very same facts that impelled MGA to plead that defense were sufficient to put MGA on inquiry notice of its potential claims. To summarize: In November 2003, MGA's CEO, Mr. Larian, knew "the top toy companies" were using false pretenses to get into private showrooms at toy fairs; in August 2003, Mr. Larian "expressed concern that Mattel might

13

obtain confidential information about unreleased MGA products previewed in MGA's showroom"; in February 2004 and January 2007, Mr. Larian "considered the possibility that Mattel might obtain confidential information about unreleased MGA products" at upcoming toy fairs; before 2006, Mr. Larian knew, from Ms. Garcia, that Mr. Villasenor, a Mattel employee, had been seen in a private MGA showroom where he should not have been, and Mr. Larian reported that information to MGA's lawyers.

Under these facts, and having expressly alleged on August 13, 2007, that Mattel engaged in "monitoring, 'spying on' or gaining knowledge of MGA's trade secrets, non-public information, nonpublic activities, unreleased products, and product development," and in "gaining access, or attempts to gain access, to MGA showrooms [and] Toy Fair displays on false pretenses," MGA cannot now say it had no "reason to suspect an injury and some wrongful cause" until 2010.

**2.     MGA's Fraudulent Concealment Claim**

As noted at the outset of our legal discussion, " 'the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations' " until the plaintiff discovers or should have discovered the claim.  (*Bernson, supra,* 7 Cal.4th at p. 931.)

MGA contends this is "a paradigmatic case for application of the fraudulent concealment doctrine," and the trial court "failed to understand that fraudulent concealment applies *even if a plaintiff knew of its cause of action,* where the defendant fraudulently concealed material facts about the nature and scope of the claim, thereby thwarting the plaintiff's investigation and running out the clock."  We do not agree.

14

MGA relies on general statements plucked from treatises and California cases dating back to 1944, but these do not assist MGA. *Bernson* states the principle we must apply. *Bernson* explained that the fraudulent concealment rule is a "close cousin of the discovery rule," and "its rationale 'is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an "otherwise diligent" plaintiff in discovering his cause of action.' " (*Bernson, supra,* 7 Cal.4th at p. 931.)

Here, MGA had already discovered its cause of action by not later than 2007. As we have just discussed at length, once a plaintiff has "reason to suspect an injury and some wrongful cause" (*Fox, supra,* 35 Cal.4th at p. 803), the plaintiff has " 'discover[ed] his cause of action' " (*Bernson, supra,* 7 Cal.4th at p. 931) and the statute begins to run. As the trial court correctly put it, by August 13, 2007, "MGA had a suspicion that Mattel had misappropriated MGA's trade secrets, using false pretenses to obtain access to MGA's unreleased products at trade fairs, and MGA articulated that suspicion in a pleading filed in federal court." The statute began to run then, and Mattel's efforts to conceal the evidence of its wrongdoing, however egregious those efforts were, did not toll the statute. As *Rita M.* observes, if a plaintiff is on notice of a potential claim, the doctrine of fraudulent concealment does not come into play. (*Rita M., supra,* 187 Cal.App.3d at p. 1460.)

MGA relies on the "*Pashley* line of authority," contending Mattel's fraud during the discovery process in federal court prevented it from a full understanding of the true facts. Fraudulent concealment may exist where there is "a legitimate hindrance to litigation." (*Pashley v. Pacific Electric Railway Co.*

15

(1944) 25 Cal.2d 226, 232 (*Pashley*); see *ibid.* ["the breach of a duty to disclose known facts with the intention to and which does hinder commencement of an action until the action would be outlawed, is a fraud practiced upon the plaintiff which in conscience estops the defendant's reliance on the statute of limitations"].)

Pashley* involved an injury to the plaintiff's eye caused by the defendant's negligent operation of a streetcar. Physicians employed by the defendant, knowing the injury would eventually destroy the plaintiff's eyesight, made various false representations to the contrary "for the purpose and with the intent of preventing the plaintiff from bringing an action within the statutory period of one year." (*Pashley, supra,* 25 Cal.2d at p. 228.) Thus in *Pashley,* while the plaintiff knew of his injury, he had no reason to suspect his vision would be destroyed. Here, by contrast, MGA both knew of its injury and articulated the precise manner in which it was being inflicted.

The other cases MGA cites in the "*Pashley* line of authority" are no different in their fundamental principles. (See *Baker v. Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315 [plaintiffs knew they were injured in the plane crash, but had no reason to suspect the defective fuel system as the cause, and the defendants' misrepresentations hindered them from doing so]; *Estate of Amaro v. City of Oakland* (9th Cir. 2011) 653 F.3d 808, 812-813, 814-815) [plaintiff mother suspected her son died as a result of injuries suffered during a police beating, but police misrepresented how her son died and withheld police reports; eight years later, an anonymous tip to the FBI led to revelation of the cover-up; misrepresentations and continued stonewalling prevented her "from appreciating the full nature of her claim and

16

dissuaded her from filing"]; *UA Local 343 v. Nor-Cal Plumbing, Inc.* (9th Cir. 1994) 48 F.3d 1465, 1475 ["Where a plaintiff suspects the truth but investigates unsuccessfully, fraudulent concealment will toll the statute."].)

MGA asserts that the "leading treatise" supports its position, but the treatise does not help either. It merely describes the *Pashley* line of cases, indicating that the plaintiff in each of those cases was injured and knew who caused it, but "there was a fraudulent concealment of the nature and extent of the injury that had the effect of inducing him not to sue." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 772, pp. 1008-1009.) Those are not the circumstances here, where MGA clearly articulated the nature of the injury and its wrongful cause in its unclean hands defense.

## DISPOSITION

The judgment is affirmed. Defendant shall recover its costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

CHAVEZ, J.[*]

_____

[*] Justice of Division Two of the Second District Court of Appeal, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17